**UNITED STATES of America, Appellee/Cross–Appellant,**

v.

**Alfred J. RIOUX, Appellant/Cross–Appellee.**

**Nos. 1717, 1913, Dockets 95–1542(L), 95–1638(XAP).**

United States Court of Appeals, Second Circuit.

Argued June 20, 1996.

Decided Oct. 2, 1996.

John C. Keeney, Acting Assistant Attorney General, Criminal Investigation Division, Department of Justice, Washington, DC (Joseph C. Hutchison, Assistant United States Attorney, District of Connecticut, New Haven, CT, of counsel), John A. Danaher, III, Executive Assistant United States Attorney, Hartford, CT, for Appellee/Cross Appellant.

James A. Wade, Robinson & Cole, Hartford, CT (Craig A. Raabe, Robinson & Cole, Hartford, CT, of counsel), for Appellant/Cross–Appellee.

Before: KEARSE, MAHONEY, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

In 1986, the people of Hartford County, Connecticut elected Alfred J. Rioux High Sheriff. Rioux was subsequently accused of extorting funds from the Special Deputy Sheriffs and Deputy Sheriffs whom he appointed in the following years. After a four-week trial in the United States District Court for the District of Connecticut (Ellen Bree Burns, *Judge*), a jury convicted Rioux of a fraudulent scheme to commit extortion, in violation of 18 U.S.C. § 1341 (mail fraud), and a violation of the Travel Act, 18 U.S.C. § 1952, arising from the same fraudulent scheme.

At sentencing, the district court reduced Rioux's minimum base offense level from twenty to ten because of his physical condition, charitable fundraising efforts, and civic accomplishments. The district court then sentenced him to three years' probation, six months of home confinement, 500 hours of community service, and a $100 special assessment. Rioux appeals his conviction on multiple grounds, and the government cross-appeals the district court's sentencing decision. We affirm the district court's decision in all respects.

## BACKGROUND

### I. *Introduction*

Elected High Sheriff in 1986, Rioux remained in that position through 1992. During this period he appointed approximately 65 Deputy Sheriffs, who conducted evictions and served legal process. Rioux also appointed 250 Special Deputy Sheriffs, who were responsible for courthouse security and the custody and transportation of state prisoners.

Rioux was also an *ex officio* member of the Hartford County Association of Deputy and Special Deputy Sheriffs ("the Association"), and he was a member of its executive committee. The Association is a private organization, akin to a Fraternal Order of Police. Rioux never paid dues to the Association; but, Special Deputies and Deputies had to pay their dues every May.

In May, 1992, the Deputies and Special Deputies began to unionize. During this period, the media exposed Rioux's corrupt practices, the upshot being an indictment stating, in part, that:

Rioux used his official position ... directly and indirectly to threaten to suspend and terminate any working Deputy or Special Deputy Sheriff:

  a. who failed to pay annual dues to the Association;

  b. who failed to purchase one or more tickets to Association fundraising events; and/or

  c. who failed to purchase one or more tickets to political fundraising events endorsed by Rioux, including events sponsored by the "Committee to Re-elect Alfred J. Rioux."

## II. *Trial*

During the trial, the government presented evidence that Rioux reviewed each Deputy and Special Deputy every Spring to determine whether he should be reappointed. As a condition of reappointment, Rioux required the Deputies and Special Deputies to pay dues to the Association. There was also evidence that Rioux required some Deputies to buy tickets to fundraisers, including events for Rioux's re-election efforts.

The exchange of money did not end there. While the Deputies and Special Deputies paid the Association, the Association paid for: (1) Rioux's monthly dues and expenses at the posh Hartford Club; (2) travel and convention expenses for Rioux and his wife; (3) restaurant expenses and numerous personal calls from Rioux's car phone; (4) a personal Christmas party and personalized Christmas cards for Rioux; (5) a lobbyist; and (6) personal contributions to the charities of Rioux's choice. The President and Treasurer of the Association, themselves Deputies, testified that they tried unsuccessfully to curb these expenses, but came to understand that if they refused to pay the bills submitted by the Sheriff they would not be reappointed.

The government also offered evidence that Rioux and supervisors within the Sheriff's Department notified Deputies and Special Deputies that reappointment was contingent upon payment of Association dues. While some Deputies testified that they received notification of this condition only from supervisors and not Rioux himself, the government produced letters from Rioux addressed to Deputies and Special Deputies announcing that their reappointment was contingent upon the payment of Association dues. After a four-week trial, the jury found Rioux guilty of one count of Mail Fraud, 18 U.S.C. § 1341, and one count of violation of the Travel Act, 18 U.S.C. § 1952.

During the course of the trial, Rioux moved to: (1) dismiss the indictment or the jury under the Sixth Amendment, the Fifth Amendment, or the Jury Selection and Service Act ("JSSA") because of an unconstitutional underrepresentation of Blacks and Hispanics in the jury pool; and (2) dismiss the indictment based on a violation of the Grand Jury Secrecy Rule. The court denied the jury representation motion, holding that Blacks and Hispanics were not underrepresented and, even if they were, the underrepresentation was not due to systematic exclusion. After considering government affidavits denying allegations of wrongdoing, the court also denied the Grand Jury Secrecy Rule motion.

## III. *Sentencing*

The Office of Probation prepared a Sentencing Report, setting a total offense level at 24, including a four point enhancement pursuant to U.S.S.G. § 3B1.1(a) for Rioux's leadership role in the extortionate arrangement. Rioux objected to the four point enhancement, arguing that he "inherited" the corrupt system from previous Sheriffs. The court agreed and reduced Rioux's offense level to 20.

The court also considered Rioux's health problems. He had a kidney transplant some 20 years ago, and as a result of the drugs prescribed for his kidney trouble, Rioux developed bone problems requiring a double hip replacement. His doctor stated that Rioux's condition required regular doses of medication and blood tests.

The court also heard of Rioux's "good acts," specifically his: (1) hiring of an impoverished Hispanic woman as a Special Deputy; (2) personal loan to an immigrant who wished to purchase a home owned by Rioux; (3) contributions to charities; and (4) leadership in fundraising efforts.

As a result of all these circumstances, the court reduced the offense level from 20 to 10, and sentenced Rioux to three years' probation, six months' home confinement, and 500 hours of community service.

Rioux appeals claiming: (1) the New Haven Division of the District of Connecticut's system of selecting jurors resulted in underrepresentation of Blacks and Hispanics in violation of the Sixth Amendment, the JSSA, and the Equal Protection Clause of the Fifth Amendment; (2) the trial judge impermissibly admitted the hearsay testimony of Deputies regarding their supervisors' statements that payment of dues was a condition of reappointment; (3) there was an impermissible variance between the evidence adduced at trial (of threatened termination *or* suspension) and the indictment (charging Rioux with threats of suspension *and* termination); and (4) the government violated the Grand Jury Secrecy Rule.

The government cross-appeals, claiming that the judge's downward departure based on Rioux's medical condition and "good deeds" was in error.

## DISCUSSION

### I. *Sixth Amendment Challenge to Jury Selection System*

#### A. *Introduction*

Rioux's major argument is that the New Haven Division of the District of Connecticut's jury selection system underrepresents Blacks and Hispanics in violation of the Sixth Amendment. He claims that, while this Court has not selected a single statistical method of analysis suitable for Sixth Amendment challenges, under any of the theories suggested by this and other Circuits, there is no question that Blacks and Hispanics were unconstitutionally underrepresented in Connecticut. We disagree.

#### B. *The Duren Test*

The District of Connecticut follows a three-step process to select a jury venire. First, the Clerk of the district court compiles a "master list" from voter registration tallies, and supplements this list with information from the Department of Motor Vehicles. Second, the Clerk weeds out from the master list those persons who are ineligible for jury service, resulting in a "qualified wheel." Finally, the Clerk selects jury venires at random from the qualified wheel.

■ The Sixth Amendment guarantees a criminal defendant a jury selected from a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 697–98, 42 L.Ed.2d 690 (1975). In *Duren v. Missouri*, the Supreme Court set forth the three elements that must be shown to establish a *prima facie* violation of the fair-cross-section requirement:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

■ Rioux has satisfied the first prong of the *Duren* test: Blacks and Hispanics are unquestionably "distinctive" groups for the purposes of a fair-cross-section analysis. *See United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir.1995).

We conclude, however, that Rioux has failed to establish the remaining two prongs of the *Duren* test: unfair underrepresentation and systematic exclusion.

## C. *Underrepresentation*

### (1) *Introduction to The Three Statistical Models*

How does one show that a distinctive group of citizens is underrepresented in jury venires? Courts have evolved several statistical approaches to assess compliance with the second prong of the *Duren* test. Rioux proposes three of these approaches and suggests that we select any one of them, arguing that, regardless of the method chosen, there is an unreasonable underrepresentation of Blacks and Hispanics. The government answers that Rioux's choice of variables in each of these statistical methods is erroneous.

Rioux presents three models of statistical analysis: (a) statistical decision theory; (b) the comparative disparity method; and (c) the absolute disparity/absolute numbers method.

### (a) *Statistical Decision Theory*

■ Statistical decision theory ("SDT") calculates probabilities and measures the likelihood that underrepresentation could have occurred by sheer chance. Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is an imperfection in the jury selection system.

Although we have used a derivative of SDT at least once to analyze a Sixth Amendment challenge to a jury selection process, *see Jackman*, 46 F.3d at 1247 n. 5, the test was not per se dispositive. Indeed, no court in the country has accepted SDT alone as determinative in Sixth Amendment challenges to jury selection systems.

The intellectual core of SDT is random selection. SDT measures the probability that the selection of a particular class of jurors (e.g., blue-eyed, blonde men) is random. In the jury context, the greater the chance of randomness, the "better" the jury selection system. But if the sample is not random (e.g., all Scandinavians are excluded from the sample), SDT will produce a skewed probability prediction. It is illogical to apply a theory based on random selection when assessing the constitutionality of a qualified wheel. By definition, the qualified wheel is not the product of random selection; it entails reasoned disqualifications based on numerous factors. It is irrational to gauge the qualified wheel—an inherently non-random sample—by its potential for randomness.

### (b) *Comparative Disparity*

■ Rioux's second proposal is the comparative disparity method, which "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur v. Beyer*, 983 F.2d 1215, 1231–32 (3d Cir.1992), *cert. denied*, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). Comparative disparity is calculated by dividing the "absolute disparity" of a group (Rioux's third method, discussed below) by the group's percentage of the population, and then multiplying by 100%. This Court has earlier considered and rejected the comparative disparity test. *See United States v. Jenkins*, 496 F.2d 57, 65–66 (2d Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). We see no reason to revisit the issue.

### (c) *Absolute Disparity/Absolute Numbers*

The absolute disparity method measures the difference between the group's representation in the general population and the group's representation in the qualified wheel. For example, if Blacks compose 10% of the entire population but only 2% of the qualified wheel, the absolute disparity is 8%. The absolute numbers approach then measures how many persons of the group you would have to add to a venire to ensure adequate representation. The absolute numbers approach is the average difference in the number of jurors per venire due to the underrepresentation. Using our example, if the absolute disparity of Blacks is 8%, between four and five Blacks would have to be added to a jury pool of 60 persons to ensure adequate representation (8% of 60 = 4.8).

■ Although we have admittedly waffled on this issue in the past, the law in this Circuit strongly suggests the absolute disparity/absolute numbers approach is appropriate in this case. In *United States v. Jen-*

kins, we adopted the absolute numbers method of analysis to examine a challenge to a jury selection system under the JSSA. *Jenkins,* 496 F.2d at 66. Later, in *Alston v. Manson,* 791 F.2d 255 (2d Cir.1986), *cert. denied,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), this Court, in dicta, criticized the *Jenkins* approach and opted for the SDT to assess a Fourteenth Amendment equal protection challenge to a jury selection system. Perhaps lured by the undeniable appeal of uniformity, the *Alston* court volunteered that "if this Court should subsequently apply [SDT] to the sixth amendment as well as the fourteenth, then the two constitutional analyses would be more congruent." *Id.* at 259.

Despite the *Alston* dicta, in *United States v. Biaggi,* 909 F.2d 662, 678 (2d Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991), this Court returned to the absolute numbers analysis, following a trend established by *United States v. Rosario,* 820 F.2d 584, 585 & n. 1 (2d Cir.1987), and *Anderson v. Casscles,* 531 F.2d 682, 685 & n. 1 (2d Cir.1976). The *Biaggi* court concluded that absolute disparities of 3.6% for Blacks and 4.7% for Hispanics, which would have required an additional two Blacks and two or three Hispanics to the venire of 60 people, did not amount to unfair underrepresentation. *Biaggi,* 909 F.2d at 677–78. We conceded, however, that the *Biaggi* fact pattern "press[ed] the *Jenkins* 'absolute numbers' approach to its limit." *Id.* at 678. We added that we "would find the Sixth Amendment issue extremely close if the underrepresentations had resulted from any circumstances less benign than use of voter registration lists" to compile the jury wheel. *Id.*

Finally, in *United States v. Jackman,* 46 F.3d 1240, 1247 (2d Cir.1995), this Court refused to apply the absolute numbers analysis. We did so for three reasons. First, we concluded that the absolute numbers/absolute disparity method was of questionable application when the minority population is a tiny percentage of the entire population. *Id.*

Second, we reiterated our concern from *Biaggi* that this method of analysis was acceptable only because the skewed minority representation resulted from something as benign as the use of voter registration lists to construct the jury wheel. The court concluded that absolute numbers would not be appropriate on the *Jackman* facts because the selection practices at issue there (a system that excluded whole towns with significant minority populations) were hardly benign. *Id.*

Finally, we noted that there were insufficient data to conclude whether the absolute numbers analysis revealed a statistically significant underrepresentation. *Id.*

▪ In our case the minority population at issue is a relatively small percentage of the entire population: Blacks are 8.33% of the population and Hispanics, 5.18%. While the central flaw of the absolute disparity/absolute numbers is admittedly present here, it is equally true that a small minority population alone is not enough to preclude the absolute numbers method. *See Biaggi,* 909 F.2d at 678. In *Jackman,* the court spurned the absolute numbers approach, not just because the minority population was small, but because: (1) the underrepresentation did not arise from a "benign" voter registration list; and (2) because some important data was missing, there were no effective means of review. In this case, the District of Connecticut juries are derived from voter registration lists and driver registration records, and no significant data are missing. We are satisfied that the absolute disparity approach is most appropriate for analyzing the underrepresentation claims in this case.

### (i) *Definitions of Variables Within the Statistical Model*

As noted above, the absolute disparity method measures the difference between the group's representation in the population and in the jury pool. The absolute numbers approach, a corollary to the absolute disparity approach, simply measures how many persons of the group would have to be added to a venire to ensure adequate representation. Before we proceed then, we must define (1) the "relevant jury pool," (2) the time period to be examined, and (3) the "population."

### (a) *Relevant Jury Pool and Time period*

The relevant jury pool may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three. The time period may be defined as: (1) the day the district selected Rioux's jury pool; or (2) some broader timeframe, perhaps over the life of the wheel.

■ Rioux and the government agree that the qualified wheel may serve as the relevant jury pool. They also concur that the focus time frame should be the qualified wheel over its "lifespan." The district court examined the average racial composition of the qualified wheel over time, not just on the day of the construction of the Rioux venire. We accept this methodology as perfectly reasonable.

### (b) *The Population*

The one statistical factor the parties cannot agree upon is the "population." Should this Court compare the qualified wheel over time to: (1) the entire population of a minority group, including children and others not qualified to serve on a jury; or (2) only a subset (those eligible to serve on a jury) of that population? Rioux urges us to factor in the entire population. The government contends that we should concentrate on a subset of the population, comparing the qualified wheel—the group of persons winnowed from the master wheel who qualify for duty—to a subset of the minority population consisting only of those minorities who are eighteen and over and otherwise qualified to be jurors.

Rioux's authority for the proposition that we should factor the entire population into the equation is language in *Duren* that the defendant must have an opportunity to select from "a fair cross-section of the community," *Duren*, 439 U.S. at 368, 99 S.Ct. at 671, and a district court case from Massachusetts that apparently used "total population" figures. *See United States v. Levasseur*, 704 F.Supp. 1158, 1161 (D.Mass.1989). We are not persuaded.

■ We conclude that the appropriate measure in this case is the eighteen and older subset of the population, regardless of other qualifications for jury service. *See,* e.g., *United States v. LaChance*, 788 F.2d 856, 865 (2d Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986). Focusing on the eighteen and over population is a fair and sensible methodology when considering the constitutionality of jury selection. As Rioux's own expert testified, the eighteen and over subset of the population is "a better benchmark ... in part, because children are excluded from it."

The government's argument that we ought to consider a smaller subset, viz., the eighteen and over and otherwise qualified segment of the population, certainly has intellectual merit. However, we cannot find any statistics in the record reflecting this measure of the population. We are comfortable, for the purposes of this case, comparing the eighteen and over subset of the minority population to the qualified wheel.

In sum, the parties concede that this Court may examine (a) the qualified jury pool (b) over time. We conclude that (c) these figures should be compared to the eighteen and over population, not the population as a whole. We next turn to the calculus.

### (2) *Application of the Absolute Numbers Approach*

■ At trial, Rioux submitted statistical evidence, seemingly uncontradicted by the Government, that the eighteen and over subset of the Black population was 7.08%, but that only 5.50% of the petit qualified jury wheel over time were Black citizens. Black citizens comprised 5.0% of the grand jury qualified wheel over time. Similarly, Rioux showed that the eighteen and over subset of the Hispanic population was 4.24%, while over time only 2.10% of them made it to the qualified wheel for petit or grand juries.

When we compare the qualified wheel over time to the eighteen and over subset of the Black population, we see an absolute disparity of 1.58% for petit juries (7.08%—5.50% = 1.58%), and 2.08% for grand juries (7.08%—5.0% = 2.08%). This means that approximately two Blacks would have to be added to a pool of 125 to compensate for the underrepresentation in petit juries (1.58% of 125 = 1.98) and an additional two or three Blacks

would have to be added to a pool of 125 to compensate for the underrepresentation in grand juries (2.08% of 125 = 2.6). Making the same comparison with respect to the eighteen and over subset of the Hispanic population, the absolute disparity is 2.14% for petit and grand juries (4.24%—2.10% = 2.14%), meaning an additional two or three Hispanics to the pool of 125 would eradicate the underrepresentation (2.14% of 125 = 2.68).

Courts in the past have deemed such numbers statistically and constitutionally insignificant even when dealing with smaller jury pools. *See, e.g., Biaggi,* 909 F.2d at 678 (failure to add two Blacks and two or three Hispanics to venire of 60 not violative of Constitution). The course of time has not changed this Court's opinion that such meager numbers do not present an infirmity of constitutional magnitude. We are thus unable to conclude that there is any unfair underrepresentation of Blacks and Hispanics in the New Haven Division of the District of Connecticut jury selection system.

### D. *Systematic Exclusion*

Even if we assume for the sake of argument that Rioux has established an unfair underrepresentation, he is impaled on the third prong of the *Duren* test: systematic exclusion of Blacks and Hispanics. He contends that the following four items of evidence illustrate systematic exclusion of minority populations in the New Haven Division of the District of Connecticut: (1) the failure to serve, by U.S. Marshal or otherwise, juror questionnaires that were returned as undeliverable; (2) the failure to maintain a list of the persons whose questionnaires could not be delivered; (3) the failure to adopt the recommendations of Magistrate Judge Margolis, who was selected to oversee the implementation of the jury selection system in the District of Connecticut; and (4) an overuse of disqualification of jurors for inability to speak English.

#### (1) *Statistics to Show Systematic Exclusion*

Without accepting the canard that if you torture the statistics long enough, they'll say anything you want them to, it remains unclear whether statistics alone can prove systematic exclusion. *See United States v. Pion,* 25 F.3d 18, 23 (1st Cir.)(statistics alone not enough), *cert. denied,* —— U.S. ——, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994). Even if they can, however, they would have to be of an overwhelmingly convincing nature. *Cf. Duren,* 439 U.S. at 366, 99 S.Ct. at 669 (defendant proved "large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year"). Nevertheless, even if one were to rely exclusively on statistics, Rioux's statistics do not illustrate systematic exclusion. As discussed above, disparities of 1.58% and 2.14% are statistically insignificant.

#### (2) *Rioux's Additional Arguments Showing Systematic Exclusion*

Rioux's additional arguments of systematic exclusion are not convincing.

There is systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces. The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes. Even if one were to accept the proposition that the use of the two-and-a-half-year-old voter registration rolls from which the District of Connecticut got potential jurors' mailing addresses was "part of the system," Rioux failed to show that any one of those undeliverable questionnaires went to a Black or Hispanic. Rioux protests that he could not show such figures because the Clerk had no list of the persons whose questionnaires were undeliverable. Rioux's counsel, however, had unrestricted access to all the envelopes returned as undelivered. He could have compiled his own list.

Magistrate Margolis recommended that the District of Connecticut should "oversample" Hispanic communities—meaning that these communities should receive concentrated mailings in an attempt to increase responses from the community. The failure to adopt this recommendation does not illustrate systematic exclusion. As the district

court recognized, such a targeting of a specific minority population might well be self-defeating since it would undermine the randomness of selection—an attribute of jury selection that is keenly desired. Furthermore, the failure to accept this recommendation is not an inherent feature of the jury selection system. In short, there is no persuasive evidence that the underrepresentation is due to the failure to adopt this recommendation.

■ As for the alleged "overuse" of disqualification because of the requirement that jurors speak English, the Supreme Court has recognized that there is room in every jury selection system for reasonable qualifications and exemptions. See Taylor, 419 U.S. at 538, 95 S.Ct. at 701–02. The requirement that jurors speak English is unquestionably reasonable, and was in no way abused by the District of Connecticut. See 28 U.S.C. § 1865(b)(3).

Accordingly, the jury selection system in the New Haven Division of the District of Connecticut does not violate the Sixth Amendment. There is simply no evidence of systematic exclusion of Blacks and Hispanics.

II. *Rioux's Intentional Discrimination and JSSA claims*

Rioux also claims that the jury selection system violates his rights under the Fifth Amendment and the JSSA. Both claims lack merit.

A. *Fifth Amendment Claim*

■ Rioux contends that the jury selection system violated his rights under the equal protection component of the Fifth Amendment's Due Process Clause, see Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 695, 98 L.Ed. 884 (1954). To succeed on a Fifth Amendment equal protection challenge to a criminal jury selection system, the defendant must establish that (1) there is a cognizable group, (2) that is substantially underrepresented by reason of (3) a selection procedure that is not racially neutral, i.e., is the result of intentional discrimination by the District. See Biaggi, 909 F.2d at 677.

We have recognized that, in determining whether there is substantial underrepresentation for the purposes of an Equal Protection challenge to a jury selection system, the court may employ SDT. See Alston, 791 F.2d at 257–58. We need not delve into the calculus of statistical underrepresentation under SDT, however, because we conclude that Rioux has failed to establish that the New Haven Division's jury selection system was intentionally discriminatory.

As an initial matter, as the District Court noted, Rioux admitted below that he "discovered no evidence of intentional discrimination by those in charge who oversaw the juror selection system." Ruling on Motion to Dismiss Indictment or Jury, No. 3:94CR193 (EBB) at 58. But now, Rioux contends that his statistics, alone, illustrating underrepresentation support the conclusion that the government engaged in intentional discrimination.

■ While it is true that clear statistical evidence may raise a presumption of intentional discrimination in some cases, this presumption may be rebutted by the government. See Alston, 791 F.2d at 257. Even assuming Rioux could have presented persuasive statistics of underrepresentation sufficient to raise a presumption of intentional discrimination, the government's evidence would have rebutted any such presumption. The government presented the testimony of Clerk Rowe of the District of Connecticut who testified that the entire jury selection process is computerized, and that there was no abuse of the system prior to its initiation. Clerk Rowe explained that the selection of jurors is done according to a mathematical quotient established in the jury selection plan for the District. This mathematical process is random, and the Clerk testified that it was not subject to intentional manipulation by those responsible for drawing jurors from the qualified wheel. The district court's finding that there was no evidence of discriminatory intent was supported by Rowe's testimony. Thus, Rioux's Fifth Amendment claim fails.

### B. *JSSA claim*

Rioux also claims that his statutory rights under the JSSA have been violated. The JSSA provides a method by which a defendant may challenge any conduct that substantially fails to comport with the JSSA. 28 U.S.C. § 1867(a) & (d). The *Duren* test "governs fair cross section challenges under both the [JSSA] and the sixth amendment." *LaChance*, 788 F.2d at 864. For the reasons stated in Section I, Rioux has failed to satisfy the *Duren* test, and thus has failed to establish a violation of the JSSA.

### III. *Vicarious Statements Under 801(d)(2)(D)*

Rioux next argues that the court abused its discretion when it admitted into evidence testimony of Deputies and Special Deputies concerning statements made by their supervisors regarding the payment of Association dues. Rioux contends that this testimony was hearsay and that the court erred by treating these statements as non-hearsay under Federal Rule of Evidence 801(d)(2)(D). We disagree and conclude that the court did not abuse its discretion. *See United States v. Coyne*, 4 F.3d 100, 114 (2d Cir.1993) (appellate review of district court's admission of evidence for abuse of discretion), *cert. denied*, 510 U.S. 1095, 114 S.Ct. 929, 127 L.Ed.2d 221 (1994).

Under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay when made "by the party's agent or servant concerning a matter within the scope of the agency or employment, [and] during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). To show that the statement is not hearsay, the government must show: "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992).

### A. *Existence of an Agency Relationship*

Rioux contends that to establish an employment relationship for the purposes of 801(d)(2)(D) the government had to prove not merely that the declarant was a subordinate of Rioux, but rather that the defendant "control[led] the daily tasks of the declarant." We disagree.

In *Zaken v. Boerer*, 964 F.2d 1319, 1322–23 (2d Cir.), *cert. denied*, 506 U.S. 975, 113 S.Ct. 467, 121 L.Ed.2d 375 (1992), the Court admitted against the president of a company statements made by the company's vice president of sales. The Court reasoned that the relationship between the declarant (as vice president of sales) and the defendant-president was sufficient under Rule 801, because the declarant was "directly responsible" to the president, who "directed [the company's] operations and ... made all the final decisions." *Zaken*, 964 F.2d at 1323.

Here the government proved that the supervisors: (1) were hand-picked by Rioux; (2) served at his pleasure; and (3) received their instructions through Rioux himself or the Chief Supervisory Special Deputy Sheriff, a position Rioux created. Under *Zaken*, the fact that these supervisors were answerable and directly responsible to Rioux, who directed the Sheriff's office operations, is enough to satisfy the first element of the test under 801(d)(2)(D).

### B. *Statements Made During the Existence of Relationship*

The government presented evidence that the statements of the supervisors were made in their capacity as managers during work hours. It was not an abuse of discretion for the district court to conclude that these statements were made during the employment relationship.

### C. *Statements Concerned Matter Within Scope of Agency*

Rioux contends that any statements made by the supervisors regarding the threat of suspension or termination for failure to pay dues were inadmissible because such employment decisions were not within the scope of their agency. We disagree and conclude that the court did not abuse its discretion. Our reasoning is twofold.

First, the declarant need not be the "final decisionmaker" on employment matters for his statement on those matters to be deemed within the scope of his agency. Rather, he need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement. *See Equal Employment Opportunity Comm'n v. Watergate at Landmark Condominium,* 24 F.3d 635, 639–40 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S. Ct. 185, 130 L.Ed.2d 119 (1994); *see also Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1238 n. 1 (2d Cir.1995) (statements of a "supervisor" who reports to the defendant regarding an employee's "performance and status" are admissible). Although the government did not present evidence that the declarants had the power to make employment decisions, there was evidence that supervisors discussed suspension decisions with Rioux. Indeed, it is hard to imagine how Rioux could make informed decisions regarding over 300 Deputies and Special Deputies without the input of their supervisors. The evidence, and reasonable inferences therefrom, amply support the conclusion that the supervisors had a role in Rioux's decisions to retain Deputies and Special Deputies.

Second, and more compelling, is the documentary evidence presented by the government. The government produced letters from Rioux to all Deputies and Special Deputies stating that dues had to be paid to the Association as a condition of employment. Given this attitude and policy of Rioux and the Sheriff's Department, it was well within the scope of the supervisor's power to enforce this policy. The statements of agents with supervisory power regarding "the attitudes, intentions or policies of … higher-ups" do concern matters within the agent's authority. *Tesch v. Txport, Inc.,* No. 93–C–4367, 1995 WL 548585, at *2 (N.D.Ill. Sept.13, 1995); *cf. Hybert v. Hearst Corp.,* 900 F.2d 1050, 1053 (7th Cir.1990). Accordingly, the court did not abuse its discretion in concluding that the supervisors' statements were within the scope of their agency.

## IV. *Prejudicial Variance and Amendment of the Indictment*

Rioux argues that: (1) there was a prejudicial variance between the evidence adduced at trial and the crimes charged in the indictment; and (2) that the judge's jury charge constituted an impermissible amendment of the indictment. These claims lack merit.

Rioux points out that the indictment charges him with threatening suspension *and* termination, while the evidence revealed threats of suspension *or* termination. This, he contends, is a prejudicial variance. But, " 'when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, … the verdict stands if the evidence is sufficient with respect to any one of the acts charged.' " *United States v. Droms,* 566 F.2d 361, 363 (2d Cir.1977) (per curiam) (quoting *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970)). Here, there was more than sufficient evidence that the Deputies' employment was contingent upon the payment of Association dues. That the evidence presented related to either termination *or* suspension, as opposed to both, is not a prejudicial variance.

Rioux also argues that the judge impermissibly amended the indictment by charging the jury regarding Rioux's threats of "suspension *or* termination," while the indictment used the words "suspension *and* termination." The rule that a jury's guilty verdict on a conjunctively worded indictment stands if the evidence is sufficient with respect to any of the acts charged, "obviously extends to a trial court's jury instructions in the disjunctive in the context of a conjunctively worded indictment." *United States v. Cusumano,* 943 F.2d 305, 311 (3d Cir.1991), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992); *see also United States v. Schiff,* 801 F.2d 108, 114 (2d Cir.1986), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987).

A constructive amendment to an indictment occurs when " 'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial

likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.' " *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir.1988) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir.1986)).

■ There was no modification of the essential elements of the offenses charged to amount to a constructive amendment. Accordingly, we reject Rioux's claim of prejudicial variance and impermissible amendment of the indictment.

## V. *Grand Jury Secrecy Rule*

Finally, Rioux argues that the district court erred (a) in refusing to hold an evidentiary hearing on whether the Grand Jury Secrecy Rule had been violated by disclosure to the media, and (b) by denying his motion to dismiss for violation of the Rule. We disagree.

■ Before a court will order a hearing on a possible breach of the Grand Jury Secrecy Rule, the defendant must establish a *prima facie* case of a violation of Federal Rule of Criminal Procedure 6(e). *See Barry v. United States*, 865 F.2d 1317, 1321 (D.C.Cir.1989). Rule 6(e)(2) provides, in part, that

[a] grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, [or] an attorney for the government ... shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules.

Fed.R.Crim.P. 6(e).

■ To determine if the defendant established a *prima facie* violation of the Rule, the court should examine, among other factors: (1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e). *See In re Grand Jury Investigation*, 610 F.2d 202, 216–20 (5th Cir.1980). A dismissal of the indictment is warranted only " 'if it is established that [there was a violation which] substantially influenced the

grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988) (citing *United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 945–46, 89 L.Ed.2d 50 (1986)) (O'Connor, J., concurring).

■ Most of the media surrounding the Rioux investigation either: (1) failed to identify the source as one proscribed under Rule 6(e); or (2) discussed federal "investigations," without actually discussing matters before the grand jury. There was at least one article, however, which the district court concluded: (1) was about matters before the grand jury; and (2) the source for which was "likely" a government official. But, after considering government affidavits denying that they were the source of the information, the district court held that Rioux failed to establish a *prima facie* violation of Rule 6(e).

Rioux argues that the government affidavits should not have been determinative. The court's consideration of the government affidavits was certainly proper. Many courts have considered such evidence in determining whether a violation of Rule 6(e) occurred. *See, e.g., In re Grand Jury Investigation*, 610 F.2d at 219–20; *In re Archuleta*, 432 F.Supp. 583, 599 (S.D.N.Y.1977); *United States v. Sweig*, 316 F.Supp. 1148, 1154–55 (S.D.N.Y.1970), *aff'd*, 441 F.2d 114 (2d Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971). There is no indication that the court felt itself bound in any way by the government's affidavits; and the district court did not err in its conclusion that Rioux failed to establish a *prima facie* violation of Rule 6(e).

## VI. *The District Court's Downward Departure*

The government argues that the district court's downward departure of ten points due to Rioux's medical condition and good deeds was in error.

■ We review the district court's decision to depart from the applicable guideline sentencing range only for an abuse of discre-

tion. *Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2043, 135 L.Ed.2d 392 (1996). Whether a factor is a permissible basis for departure is included in our abuse of discretion review because "the abuse of discretion standard includes review to determine that the [court's discretion in the sentencing determination] was not guided by erroneous legal conclusions." *Id.* at ——, 116 S.Ct. at 2048.

 Physical condition is not ordinarily relevant to determining whether the defendant should receive a departure from the applicable guideline range. *See* U.S.S.G. § 5H1.4. But, an "extraordinary physical impairment" may be reason enough to impose a sentence below the guideline range. *Id.* Such conditions are ones that render the defendant " 'seriously infirm.' " *United States v. Altman,* 48 F.3d 96, 104 (2d Cir. 1995). So too, civic, charitable, and public service and similar prior "good works are not ordinarily relevant" in determining whether the defendant should receive a downward departure. U.S.S.G. § 5H1.11. In extraordinary cases, however, the district court may downwardly depart when a number of factors · that, when considered individually, would not permit a downward departure, combine to create a situation that "differs significantly from the 'heartland' cases covered by the guidelines." U.S.S.G. § 5K2.0 cmt.

■ The district court did not abuse its discretion when it concluded that Rioux's case differed significantly from the heartland of guideline cases. Rioux had a kidney transplant over 20 years ago, and his new kidney is diseased. Although his kidney function remains stable, he must receive regular blood tests and prescription medicines. As a complication of the kidney medications, Rioux contracted a bone disease requiring a double hip replacement. Although the replacement was successful, it does require monitoring. While many of Rioux's public acts of charity are not worthy of commendation, he unquestionably has participated to a large degree in legitimate fund raising efforts. Of particular moment are Rioux's efforts to raise money for the Kidney Foundation.

It was not an abuse of discretion for the district court to conclude that, in combination, Rioux's medical condition and charitable and civic good deeds warranted a downward departure.

## CONCLUSION

For the foregoing reasons we affirm the district court's determinations in all respects.