### UNITED STATES

v.

### Daniel M. PARADIES, Defendant.

### Criminal Action No. CR 193–310.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 20, 1998.

**1316**

Sally Quillian Yates, Office of the U.S. Attorney, Atlanta, GA, for Plaintiff.

Roger C. Appell, Birmingham, AL, Robert Klonoff, Jones, Day, Reavis & Pogue, Washington, DC, for Defendant.

## ORDER

ALAIMO, District Judge.

Defendant, Daniel M. Paradies ("Paradies"), was convicted by a jury on January 22, 1994 of eighty-three counts of mail fraud in violation of Title 18 U.S.C. §§ 1341 and 1346, and one count of conspiracy in violation of Title 18 U.S.C. § 371 by making corrupt payments to public officials in violation of Title 18 U.S.C. § 666. The charges arose out of Defendant's participation in fraudulent schemes involving the concessions at the Atlanta Hartsfield International Airport ("Atlanta Airport"). On April 19, 1994, the Court sentenced Paradies to thirty-three months in prison, which was at the low end of the range determined by the application of the Federal Sentencing Guidelines.

Paradies then embarked on a lengthy appellate process. He directly appealed his conviction to the Eleventh Circuit Court of Appeals, where both his conviction and sentence were affirmed. *United States v. Paradies*, 98 F.3d 1266 (11th Cir.1996). Following this decision, Paradies filed a petition for rehearing and suggestion of rehearing *en banc*, which the Eleventh Circuit unanimously denied on December 26, 1996. On February 21, 1997, Paradies filed a petition for certiorari. The United States Supreme Court denied certiorari on December 8, 1997.

*Paradies v. United States,* — U.S. —, 118 S.Ct. 598, 139 L.Ed.2d 487 (1997). Paradies then filed an emergency motion with the Eleventh Circuit for leave to file a second petition for rehearing and a motion for stay contending that there had been an intervening change in the law since the Eleventh Circuit affirmed his conviction. The Eleventh Circuit denied the motion. Throughout the appellate process, Paradies has remained free on an appeal bond.

Currently before the Court are Defendant's Motion for Re-sentencing pursuant to 28 U.S.C. § 2255 and his Motion for Extension of Reporting Date. On January 22, 1998, the Court held a plenary evidentiary hearing on these motions. For the reasons set forth below, Defendant's Motion for Re–Sentencing is **GRANTED** and his Motion for Extension of Reporting Date is **DENIED**.

## FACTS

### I. *Conviction*

Prior to his conviction, Paradies was the President, Chief Executive Officer, and principal shareholder of The Paradies Shops, Incorporated ("Paradies Shops"), a chain of gift shops located in major airports throughout the United States. Paradies also was the President of Paradies Midfield Corporation ("Midfield"), a company that operated gift shops exclusively in the Atlanta Airport. Paradies Shops owned sixty-five percent of Midfield's stock. The remaining thirty-five percent of Midfield's stock was owned by minority-controlled businesses. In 1979,

when Midfield first contracted to operate gift shops in the Atlanta Airport, its other stockholders included three corporations, each wholly-owned by African–Americans. Mack Wilbourn ("Wilbourn") held 18.3 percent of Midfield stock, Nathaniel Goldston ("Goldston") held 13.7 percent, and Joanne McClinton ("McClinton") held three percent of the stock. The ownership of Midfield complied with a minority participation requirement.[1]

The alleged wrongdoing began in 1985, when Ira Jackson ("Jackson"), a member of the Atlanta City Council, made a "loan" to Goldston of fifty thousand dollars through Jackson's wife.[2] The Government produced evidence at trial that the purported loan actually was the purchase of Goldston's interest in Midfield. After Jackson made the "loan," he requested an opinion from the City's Board of Ethics whether it would be permissible for his wife to purchase Goldston's interest in Midfield. The Board concluded that the purchase would violate Jackson's fiduciary duty to the city. Despite the Board's opinion, Jackson not only retained Goldston's interest, but also acquired the interests of Wilbourn and McClinton.[3]

Paradies denied any knowledge of Jackson's interest in Midfield. The Government, however, proved at trial that Paradies and Jackson conspired to use Jackson's influence, first as an Atlanta City Council member, and later as the Commissioner of Aviation in Atlanta, to reduce rents for Paradies' concessions at the Atlanta Airport.[4] In exchange

---

**1.** Dobbs Paschal Midfield Corporation ("Dobbs"), the principal concessionaire at the Atlanta Airport, contracted with various subconcessionaires, including Midfield, to provide services at the airport. For unknown reasons, Dobbs required a thirty-five percent minority interest in Midfield.

**2.** Jackson was a co-Defendant in the Atlanta Airport corruption case in which Paradies was convicted. Jackson was convicted by a jury of forty-two counts of receiving corrupt payments in violation of Title 18 U.S.C. § 666 and four counts of subscribing to false income tax returns, which under-reported his income, in violation of Title 26 U.S.C. § 7206(1). The Court sentenced Jackson to forty-two months in prison, which he presently is serving.

**3.** Jackson "loaned" Wilbourn two hundred and seventy five thousand dollars from Options International, Incorporated, a corporation created in the name of Jackson's son, but controlled by

Jackson. Wilbourn used fifty thousand dollars from the loan to purchase Goldston's stock. Wilbourn then transferred all of his and Goldston's interest in Midfield to Hartsfield Concessions, Incorporated ("Hartsfield Concessions"), which Wilbourn purportedly wholly-owned. The Government, however, produced evidence that the entire transaction was a sham, and that Jackson was the de facto owner of Hartsfield Concessions and the interest in Midfield. In August of 1988, Hartsfield Concessions purchased McClinton's interest in Midfield.

**4.** For example, in July of 1987, Jackson voted in favor of Amendment Number Five, which reduced the rent charged to the concessionaires at the Atlanta Airport. Then, in 1989, Jackson argued that Amendment Number Six, a rent reduction proposal, should include larger concessionaires, like Midfield. After the City Council passed the Amendment, Paradies increased the management fees paid to Hartsfield Concessions.

for Jackson's assistance, Paradies paid Jackson in the form of management fees and dividends.

Paradies also was involved in a separate fraudulent scheme. Paradies had an agreement with Harold Echols ("Echols"), another concessionaire at the Atlanta airport, concerning direct payoffs to Atlanta City Council members. Echols made routine payments to Jackson and other City Council members for favorable votes in matters before the Council, and Paradies reimbursed him for the payments.

## II. *Evidentiary Hearing*

Paradies has filed a Motion for Re-sentencing pursuant to 28 U.S.C. § 2255 and a Motion for Extension of Reporting Date. On January 22, 1998, the Court held a plenary evidentiary hearing on these motions. The Court's findings of fact are set forth in detail below.

At seventy-seven years of age, Paradies presently suffers from severe osteoarthritis in his knees, hands, spine, and neck. This aliment significantly limits his activities. Once an avid golfer and tennis player, Paradies was forced to stop participating in both activities several months ago. He now is unable to walk more than two blocks at a time. His regular physician, Dr. Andrew A. Abernathy, III ("Dr. Abernathy"), predicts that the arthritis will worsen with time and, eventually, will be crippling.[5] In addition to the arthritis, Paradies experiences pain in his left shoulder due to a torn rotator cuff. He takes Ibuprofen for his pain and Donnatel, an antispasmodic drug, to sleep.

Paradies also has an enlarged prostate. Because of this condition, he cannot empty his bladder completely and, as a result, must get up several times a night to urinate. To ease his discomfort, Paradies takes Hytrin. Prior to the evidentiary hearing, he underwent a Prostate Specific Antigen test, which is used to detect carcinoma.[6] He received an 8.4 on that test, twice the normal result. Dr. Abernathy testified that the results "may or may not indicate a cancerous condition of the prostate." No follow-up test for this condition has been performed, nor has any conclusive medical diagnosis been made at this time.

Additionally, in April of 1994, while in Florida, Paradies experienced pain in his chest. A cardiologist diagnosed the pain as a pinched nerve, and Dr. Abernathy concurred in that diagnosis.[7] Paradies did not see a cardiologist about his pain at this time. Paradies testified that he has continued to experience periodic chest pain since April of 1994. He did not, however, inform Dr. Abernathy of this pain during his annual visits in 1995 and 1996.[8]

On January 5, 1998, Paradies saw Dr. John Hurst ("Dr.Hurst"), a cardiologist. Dr. Hurst ran an electrocardiogram, which showed only a minor abnormality in Paradies' heart. Additionally, the results of the electrocardiogram showed no definitive change from those run annually by Dr. Abernathy, over the previous four years. Dr. Hurst also performed a routine exercise stress test on Paradies. The results of the test, however, were inconclusive because Paradies could not get his heart rate up to the appropriate level.[9] Dr. Hurst then performed an Adenosine stress test on Paradies. The results of this test showed disease in one major vessel and one minor vessel leading to the heart, but did not show occlusion in any vessels. Dr. Hurst testified that based on

---

**5.** Dr. Abernathy saw Paradies once in 1985, and then for annual visits from 1994 to 1997. Dr. Abernathy's last physical examination of Paradies was in May of 1997.

**6.** Dr. William A. Reid, a general surgeon, performed the test. He examined Paradies on January 5, 1998 for approximately an hour and a half. After the examination, Dr. Reid referred Paradies to Dr. John Hurst, a cardiologist.

**7.** After Paradies' annual visit in 1994, Dr. Abernathy wrote him a letter setting forth the results of his examination. In the letter, Dr. Abernathy

stated that he believed Paradies' chest pain to be the result of a pinched nerve.

**8.** Dr. Abernathy does not have a record of any complaints made by Paradies about chest pains. Dr. Abernathy explains the absence of complaints by the fact that Paradies is a stoic man, who rarely complains.

**9.** Defendant was able to run for only four and a half minutes, primarily due to his arthritis. In order to reach his peak heart rate, Defendant would have had to run for at least six or seven minutes.

the Adenosine test results, he did not find Paradies' heart condition to present a significant health concern.[10]

In addition to his physical aliments, Paradies has experienced depression since his trial and conviction. However, he has not seen a psychiatrist. Instead, he testified that he confides in his friend, Richard Stern, on a daily basis. On January 19, 1998, a few days prior to the evidentiary hearing, Dr. Reid prescribed Prozac for Paradies.

One factor that has contributed significantly to Paradies' depression is his lack of involvement in his business. After his conviction, Paradies resigned from his position as President of Paradies Shops, and Richard Dixon ("Dixon") assumed this position. Currently, Paradies has no involvement in any aspect of the business. He speaks to Dixon once a month. The two, however, do not discuss the company. Paradies still owns forty-eight percent of the stock in Paradies Shops, but it is held in an irrevocable blind trust. He does not control, nor is he allowed to vote the stock.

Prior to the trial, Paradies was active in serving his country and his community. He was an officer in the Air Force from 1942 until 1945. While in the service, he was involved in a mid-air collision and was the only survivor of the crash. He has participated in several charitable causes. Paradies was an active member of the Rotary Club and the Kiwanis. He also served on the boards of the YMCA and the Lakewood Boys Club. Furthermore, he established and contributed to the Paradies/Ruffen scholarship for underprivileged children and was the chairman of the Georgia chapter of the Marines' Toys for Tots for several years.

## DISCUSSION

Defendant contends that the Supreme Court's decision in *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), provides the Court with authority to re-examine his thirty-three month sentence

imposed on April 19, 1994. Defendant claims that a number of factors in this case warrants a downward departure from the Federal Sentencing Guidelines ("Guidelines"). The Government, however, contends that a downward departure is not warranted under these circumstances. Additionally, the Government contends that Defendant's Motion for Re-sentencing does not present a claim cognizable under Title 28 U.S.C. § 2255. For the purposes of this Order, the Court will assume, without expressly determining, that Defendant's motion presents a cognizable claim. *See Smullen v. United States*, 94 F.3d 20, 23 (1st Cir.1996) (holding that a defendant may raise Federal Sentencing Guideline issues in a § 2255 motion if he can show cause for his failure to raise the issue previously and actual prejudice). *See also Oliver v. United States*, 90 F.3d 177, 179 (6th Cir.1996); *Box v. United States*, 42 F.3d 1388 (6th Cir.1994); *United States v. Allen*, 16 F.3d 377 (10th Cir.1994).

Under the Guidelines, sentencing courts ordinarily are required to impose sentences within the applicable Guideline range. 18 U.S.C. § 3553(a) (1985). The sentencing court should treat each guideline as carving out a "heartland;" that is, "a set of typical cases embodying the conduct that each guideline describes." *Koon*, 518 U.S. 81, 116 S.Ct. at 2044, 135 L.Ed.2d at 409. However, when presented with an atypical case, a court may consider whether a departure from the Guidelines is warranted. *Id.* A case is atypical when "there are circumstances of a kind or degree not adequately taken into consideration by the Commission." *Id.* (citing 1995 U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b)).

To determine if departure from the Guidelines is appropriate, sentencing courts must look at the factors present in each case. Certain factors never provide the basis for a departure, such as a defendant's race, sex, national origin, creed, religion, socio-econom-

---

10. In contrast, Dr. Reid, a general surgeon, testified that he believed Paradies' heart condition to be serious. Dr. Reid, however, does not practice cardiac medicine, except for examinations prior to surgical procedures. He diagnosed Paradies with Clinical Angina and prescribed Nitroglycerin for the condition. Dr. Abernathy concurred in Dr. Reid's diagnosis because of Paradies' chest

pain in Florida in 1994. The Court, however, finds that Dr. Reid's concern about Paradies' heart condition is against the weight of the evidence based on the results from both the electrocardiogram and the Adenosine stress test, as well as the opinion of an experienced cardiologist, Dr. Hurst.

ic status, lack of guidance as a youth, chemical dependance, and economic hardship. *See* 1997 U.S.S.G. §§ 5H1.4; 5H1.10; 5H1.12; 5K2.12. Other factors are categorized by the Guidelines as either "encouraged" or "discouraged" bases for departure. Encouraged factors are those "the Commission has not been able to take into account fully in formulating the guidelines." 1997 U.S.S.G. § 5K2.0. Conversely, discouraged factors are those "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." 1997 U.S.S.G. ch. 5, pt. H, intro. cmt. If the factor is a discouraged one, or an encouraged factor already considered by the applicable Guideline, a court should depart only if the factor is present to an exceptional degree. *Koon,* 518 U.S. 81, 116 S.Ct. at 2045, 135 L.Ed.2d at 410–11. Courts may depart from the Guidelines based upon either an individual factor or a number of factors combined. *See United States v. Rioux,* 97 F.3d 648, 662 (2d Cir.1996) (citing 1995 U.S.S.G. § 5K2.0 cmt.).

■ Paradies claims that there are several factors which take his case out of the heartland of sentencing cases, including advanced age, poor physical and mental health, vulnerability to abuse in prison, economic loss, military service, and charitable activities. He urges the Court to depart downwardly from the applicable Guideline range based on his unique circumstances. Defendant's allegations of vulnerability to prison abuse and economic loss are not relevant to the Court's determination of whether a downward depar-

ture is warrant in this case.[11] The remaining factors are discussed below.

■ First, Paradies claims that downward departure is appropriate based on his advanced age and poor health. Paradies is seventy-six years of age and does suffer from osteoarthritis, a torn rotator cuff, an enlarged prostate, and chest pains. However, age and physical condition are discouraged factors, and in most cases, neither is relevant in determining the appropriate sentence. 1997 U.S.S.G. §§ 5H1.1, 5H1.4. Only in extraordinary circumstances may these factors warrant a downward departure from the Guidelines. Specifically, the Guidelines provide that a downward departure based on age may be appropriate only "when a defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." 1997 U.S.S.G § 5H1.1. Similarly, the Guidelines state that a downward departure based on poor physical condition may be appropriate only when a defendant has "an extraordinary physical impairment." 1997 U.S.S.G. § 5H1.4.

The Court is reluctant to carve out an exception in the Guidelines for those who are advanced in age. If the Court were to create such an exception, the elderly could violate the law with impunity. Instead, those advanced in age, like the young, must face the consequences of their illegal actions. Moreover, several of the individuals who were involved in the fraudulent schemes with Paradies are older than sixty years of age. De-

---

11. Paradies claims that the combination of his advanced age, poor health, and familial relationship with a United States Federal District Judge renders him vulnerable to abuse in prison. The Court does not agree. The Defendant relies on *Koon,* where the Supreme Court upheld a downward departure based on susceptibility to abuse in prison where the defendants were police officers convicted of civil rights violations in a highly publicized trial. 518 U.S. 81, 116 S.Ct. at 2045, 135 L.Ed.2d at 410–11. The facts of this case, however, differ significantly from those in *Koon* and do not support the conclusion that Paradies is susceptible to prison abuse. Furthermore, Paradies has been designated to a minimum security camp in Atlanta, where the threat of violence is minimal. Like Paradies, the other inmates at the camp have been convicted of nonviolent crimes. Moreover, the Court does not believe that inmates will target Paradies merely

because his brother-in-law is a Federal District Judge.

Nor does the fact that Defendant suffered economic loss take his case out of the heartland of cases. The Court does not dispute Paradies' loss. He resigned from his position as President and CEO of Paradies Shops, and he is no longer able to work in his business. Paradies Shops has been barred from several airports, and Paradies is no longer trusted in the business community. Defendant's economic loss, however, does not make this case atypical. Instead, his loss is the natural consequence of his own illegal actions. *See Koon,* 518 U.S. 81, 116 S.Ct. at 2052, 135 L.Ed.2d at 420 (stating that "it is not unusual for a public official who is convicted of using governmental authority to violate a person's rights to lose his or her job and to be barred from future work in that field.")

spite their ages, they all have served, or presently are serving, their sentences. Under these circumstances, a downward departure based solely on Paradies' age would be unjust.

■ In addition to his advanced age, Paradies suffers from osteoarthritis in his knees, hands, spine, and neck and, also, has a torn rotator cuff in his left shoulder. These ailments, individually, are not such extraordinary physical impairments as to take Defendant's case out of the heartland of cases which are before courts for sentencing. Indeed, Paradies' osteoarthritis and his torn rotator cuff significantly limit his daily activities. Paradies no longer is able to play golf or tennis. Like many who have advanced in age, he has been forced to alter his lifestyle. Nonetheless, he still is physically able to serve his prison sentence. Numerous inmates in the Federal Bureau of Prisons suffer from ailments similar to those suffered by Paradies. (Gawrysiak Test. Evidentiary Hr'g). As a result, federal prison officials are experienced in treating such conditions and will be able to accommodate Defendant's needs. Prison officials will not assign Paradies any task or activity that he is unable to perform. (*Id.*)

Nor does the fact that Defendant suffers from an enlarged prostate make his case atypical. Currently, his prostate condition is treatable with Hytrin. While Dr. Abernathy testified that the results of Paradies' most recent Prostate Specific Antigen test may indicate cancer, there has been no such finding at this time. Moreover, even if Paradies were to develop a more serious condition while serving his sentence, the Federal Bureau of Prisons could provide him with excellent medical care. The Federal Bureau of Prisons has two major referral centers, one in Springfield, Missouri, and another in Rochester, Minnesota, where Paradies could receive specialized treatment. The Court recognizes that Paradies' prostate condition causes him discomfort and requires certain accommodations. However, the Federal Bureau of Prisons will be able to address any of Paradies' special needs.

Similarly, Defendant's heart condition is not so extraordinary as to take this case out of the heartland of cases. *See United States v. Altman,* 107 F.3d 4 (2d Cir.1996) (unpub-

lished table decision), reported at 1996 WL 739239 (affirming district court's refusal to depart downwardly based on the defendant's serious heart problems because the Federal Bureau of Prisons adequately could monitor the condition); *United States v. Booher,* 962 F.Supp. 629 (D.N.J.1997) (denying downward departure based on defendant's advanced age and coronary heart disease). Based on the evidence before the Court, Paradies' heart condition does not appear to be life-threatening. The results of his electrocardiogram over the past four years showed no definitive change. The Adenosine stress test conducted on January 5, 1998 revealed disease in one major vessel and one minor vessel, but no occlusion. Based on these results, Dr. Hurst, an experienced cardiologist, testified that he did not believe that Paradies' heart condition was a significant cause for concern. Furthermore, he testified that Paradies exhibited few of the risk factors associated with heart problems.

While Dr. Reid and Dr. Abernathy expressed concern about Paradies' heart condition, the Court finds their conclusions to be against the weight of the evidence. Indeed, Paradies may suffer from clinical angina. This condition, however, does not indicate heart disease. Instead, angina is merely chest pain associated with a lack of blood supply to the heart muscle. Currently, Paradies' heart condition is treatable with Nitroglycerin and can be monitored by the Federal Bureau of Prisons. Again, if Paradies' condition were to worsen during his sentence, the Federal Bureau of Prisons could provide him with appropriate medical care.

■ In addition to his physical ailments, Defendant claims that his poor mental health warrants a downward departure. Indeed, Paradies has experienced depression since his trial and conviction. The Court, however, does not find Defendant's mental state, when considered alone, to be sufficiently severe as to provide a basis for downward departure. Paradies began taking medication for his depression only a few days before the evidentiary hearing, and he has never consulted a psychiatrist regarding the condition. Moreover, significant depression following a felony conviction is to be expected. There is no

**1322**

evidence in this case that Paradies' mental state is unusual for a convicted felon.

 These ailments, considered individually, are not so extraordinary as to take Defendant's case out of the heartland of cases before courts for sentencing. The combination of ailments, however, presents a situation not adequately considered by the Sentencing Commission when formulating the Guidelines. *See United States v. Collins,* 122 F.3d 1297, 1307 (10th Cir.1997) (upholding a downward departure based on a combination of factors including high blood pressure, ulcers, arthritis and prostatitis); *Rioux,* 97 F.3d 648 (upholding downward departure based on a combination of factors including, kidney disease, bone disease and charitable acts). Paradies is seventy-six years of age and approaching the end of his life. While the Court is unable to predict Defendant's life expectancy, based on his age and various infirmities, it is clear that a thirty-three month sentence is more onerous for Paradies than for most defendants. In reality, Defendant's thirty-three month sentence may turn out to be a life sentence.

Moreover, during his life, Paradies served his country and community. He was an officer in the Air Force during World War II and has given both his time and money to numerous charitable organizations. Considered alone, his actions in this regard are not extraordinary. However, when considered with the other factors present in this case, Paradies' service to his country and community support a downward departure from the Guidelines. *See Rioux,* 97 F.3d at 663.

While a downward departure from the Guidelines is warranted, justice requires that Paradies still serve a portion of his original sentence. As previously stated, the others involved in the illegal schemes with Paradies also are advanced in years. Yet, they all have served, or presently are serving, their sentences. Paradies must not be allowed to avoid the consequences of his illegal actions. Based on the evidence before the Court, a reduction of his sentence to an eighteen month commuted sentence reflects Paradies' unique situation. Granting a greater departure would contravene the intent of the Sentencing Commission and the purpose of the Guidelines.

*CONCLUSION*

The Court has assessed thoroughly the various factors present in Defendant's case. The Court finds that, in the aggregate, circumstances exist that are of a kind or degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. Upon consideration of these circumstances, the sentence imposed should vary from the sentence required by the Guidelines. Because the Court finds Defendant's case to be outside the heartland of cases, the Court **GRANTS** a downward departure to a sentence of commitment to the Bureau of Prisons for a term of eighteen month. All other provisions of the original sentence shall remain in full force and effect. Defendant's Motion for Extension of Reporting Date is **DENIED**.

**SO ORDERED.**