OPINION OF THE COURT
Steven W. Fisher, J.
In the two indictments before the court, defendant John *673 Taylor stands charged with murder in the first degree and lesser crimes in connection with a robbery and shooting that left five persons dead and two injured inside a Wendy’s restaurant in Flushing, Queens. With respect to each indictment, the People have served and filed a notice of intent to seek the death penalty pursuant to section 250.40 of the Criminal Procedure Law.
The defendant now moves, inter alia, for an order dismissing both indictments, pursuant to section 210.35 (1) and section 210.20 (1) (c) of the Criminal Procedure Law, on the ground that the grand juries that returned them were illegally constituted. In conjunction with that application, he asks that the court order the Queens County Jury Division, the Queens County District Attorney, and the State Office of Court Administration to allow counsel access to any and all records and materials related to grand jury selection in Queens County from 1976 until the present.
In his supporting papers as originally submitted, the defendant maintained that “poor people, persons aged 18 to 34, Hispanics, Blacks, women, and other distinctive and cognizable groups that constitute a substantial portion of the voting age citizen population of Queens County — in relation to their proportion of the eligible population — are systematically, historically, significantly and unconstitutionally under represented at every stage of the process in which grand jurors are selected.”[1] The defendant argued further that “such under representation is the result of discretionary, subjective, nonrandom, and otherwise illegal procedures which systematically and/or intentionally under represent these distinctive and cognizable groups at various points throughout the grand jury selection process.”[2]
In order to demonstrate the existence and degree of the claimed underrepresentation, the defendant twice petitioned the Appellate Division, pursuant to section 509 of the Judiciary Law, for an order directing the Queens County Jury Commissioner and the Office of Court Administration (OCA) to disclose to defense counsel all “juror qualification questionnaires” and “a record of persons who are found not qualified or disqualified or who are exempted or excused, and the reasons therefor” in Queens County, from 1991 to the present. In the alternative, the defendant asked that such disclosure be made *674 to the Appellate Division itself, and that the Court seal the material for appellate review. Both petitions were denied (Matter of Taylor v People, 277 AD2d 322 [2d Dept 2000]; Matter of Taylor v People, 287 AD2d 641 [2d Dept 2001]).
The defendant has now refined his claim, focusing on what he insists is the substantial underrepresentation in the grand jury pool of “Híspanles,” “the young,” and “the poor.” He no longer maintains that there is a demonstrable underrepresen-tation of African-Americans or women.
I.
In order to mount a successful challenge to the composition of the grand juries that indicted him, the defendant must first demonstrate either that persons belonging to a distinctive, substantial, and identifiable group were not represented fairly or reasonably in the venires from which the grand juries were selected when compared to the number of such persons in the community (see, e.g., Duren v Missouri, 439 US 357, 364 [1979]; People v Guzman, 60 NY2d 403, 410 [1983], cert denied 466 US 951; see, also, Peters v Kiff, 407 US 493, 502-504 [1972] [plurality opinion]), or that a recognizable and distinct class, which historically has received different treatment under the law as written or applied, has been substantially underrepresented in the grand jury pool, over a significant period of time, as compared to its proportion in the total population (see, e.g., Castaneda v Partida, 430 US 482, 494 [1977]; Guzman, 60 NY2d at 412; see, also, Rose v Mitchell, 443 US 545, 565 [1979]). The first suggests a fair cross-section violation, the second a violation of equal protection.[3]
Underrepresentation alone, however, will not establish a constitutional violation. To make out a prima facie showing requiring the government to respond, a defendant must demonstrate that the underrepresentation actually resulted from the selection procedures employed. Thus, a fair cross-section claim requires a showing that something inherent in the selection process resulted in the systematic exclusion of the underrepresented group (see, Duren, 439 US at 364, 366; Guzman, *675 60 NY2d at 410-411). And an equal protection claim demands a showing of purposeful discrimination against members of the underrepresented group — discrimination that will be presumed if the selection procedure “is susceptible of abuse or is not racially neutral” (Castaneda v Partida, 430 US at 494; see, also, Duren, 439 US at 368, n 26).
To meet his initial burden of demonstrating underrepresen-tation, the defendant here has asked for the release of “any and all records and materials related to the grand jury selection in Queens County from 1976 until the present.”[4] He argues that he “must be granted access to the only information from which he could possibly accurately learn the degree to which Hispanics and other groups are excluded from the Queens jury selection process — the lists of prospective jurors upon which that process is based.”[5] Thus, he asks the court to issue subpoenas directing that he be provided with: “the prospective file from 2000 and 2001 * * * the source lists from which that prospective file was compiled * * * and the names and addresses of those people who were sent questionnaires, returned questionnaires, were sent, but did not return questionnaires, and to whom undeliverable questionnaires were sent.”[6]
There is, in my view, a substantial question as to whether I have the authority to grant the defendant’s requests in light of language in Judiciary Law § 509 (a) reserving to the Appellate Division the right to order disclosure of jury material (see, People v Jones, 213 AD2d 801 [3d Dept 1995], lv denied 85 NY2d 975; cf. People v Chinn, NYLJ, Nov. 19, 1996 [Onondaga County Ct, Mulroy, J.]).[7] Moreover, even if I had authority to grant disclosure, a serious question would remain as to the preclusive effect of the Appellate Division’s earlier denial of the defendant’s two petitions (cf. People v Shulman, Suffolk County Ct 1998, Pitts, J., Index No. 1112-96).
I therefore searched for a way to explore the defendant’s seemingly serious constitutional claim in this capital case *676 without first resolving these difficult disclosure issues. The course I chose was simply to assume an underrepresentation of groups identified by the defendant (cf People v Betancourt, 153 AD2d 750, 753 [2d Dept 1989], lv denied 75 NY2d 767; People v Blake, 170 AD2d 613, 614 [2d Dept 1991]), and then to conduct a hearing to determine whether the procedures employed to select grand jurors in Queens County would be expected to produce that underrepresentation. If so, I reasoned, a far more compelling argument could be made for disclosure that would demonstrate underrepresentation in fact (cf. Guzman, 60 NY2d at 415; People v Chinn, supra). If not, any underrepresentation would be unrelated to selection procedures and the defendant’s claim would be defeated without the need for the demanded disclosure.
II.
To preserve the defendant’s right of cross-examination, I took it upon myself to call witnesses to explain the jury selection procedures employed in Queens County. I called Chester Mount, the director of OCA’s Office of Court Research who has been working on the jury system since 1983, and Alexis Cuffey, the Second Deputy County Clerk of Queens County who heads the Juror Division under the Queens County Commissioner of Jurors. In addition, I invited each side to have an expert present during the testimony of the two witnesses. The defendant accepted the invitation, and Andrew Beveridge, a professor of sociology at Queens College, was present in the courtroom for the testimony of Mr. Mount and Ms. Cuffey. Professor Bever-idge later testified at the hearing on the defendant’s behalf as an expert in the field of demographic and statistical methods.
Based upon the testimony of Mr. Mount and Ms. Cuffey, I make the following findings of fact:
To compile a list of names from which to draw jurors statewide, the Unified Court System of New York (hereafter UCS) uses five “source” lists — more than any other jurisdiction except the District of Columbia. Each year, it obtains a list of all registered voters in the state, a list of all licensed drivers in the state, a list of all persons in the state who filed tax returns in the most recent tax year, a list of all persons in the state who received family or safety net assistance in the preceding year, and a list of all persons in the state who received unemployment compensation in the preceding year.
Some people, of course, appear on more than one list. Thus, for example, a registered voter may also be a licensed driver *677 and a taxpayer. Because duplication of names affects the randomness of selection, UCS attempts to detect and eliminate duplicates when it merges the five source lists into one. At the hearing, this merged list was referred to as the “master list.”
After the master list is compiled through the merging of the source lists, it is compared against a list of persons who have had recent contact with the system. That list is called the “automated jury files.” It contains the names of all persons to whom UCS has recently sent a juror questionnaire, and all persons who are disqualified because they did jury service within the previous two or four years, depending on the county. In Queens County, persons called in for jury duty are disqualified, and therefore may not be called again, for the next four years; persons who actually serve on a grand jury for more than 10 days are disqualified for the following eight years.
Because UCS does not want to send questionnaires to those who have recently received them or who are still disqualified as a result of completed service, an attempt is made to remove from the master list all the names that also appear on the automated jury files. This is done through a process of duplicate detection, much the same process as the one employed when the five source lists are merged.
When names appearing in the automated jury files are removed from the master list, the result is the “prospective jury file.” Persons named in the prospective jury file are those who have appeared on at least one of the source lists, have not had recent contact with the system, and are not disqualified because of recent jury service. This is the group from which individuals will be selected at random to receive juror questionnaires.
To satisfy the needs of the courts of Queens County when they are in full session,[8] the Commissioner of Jurors sends out summonses to approximately 5,500 persons each week to serve on trial juries. And the Commissioner sends out some 700 summonses each month for persons to serve on the county’s grand juries. All of those summonses are sent to persons whose names appear in the pool of qualified jurors for Queens County. At any one time, there are generally between 20,000 and 25,000 names in that pool.
*678 As summonses are sent out and people summoned respond for jury service, the number of names remaining in the qualified pool naturally diminishes. The Commissioner of Jurors, therefore, must periodically replenish the pool to insure that it stays sufficient to meet the county’s needs. She does that by asking UCS to send out juror questionnaires to a randomly-selected group of Queens residents whose names appear in the prospective jury file. Again, persons named in the prospective jury file are those who have appeared on at least one of the source lists, have not had recent contact with the system, and are not disqualified because of recent jury service.
In an average week when the Queens courts are in full session, the county’s Commissioner of Jurors will ask that between 10,000 and 15,000 questionnaires be sent out. UCS sends out the questionnaires, and makes them returnable to the Commissioner.
Of the questionnaires sent out, between 45 and 50% are completed and returned to the Jury Commissioner. The most frequently-noted reasons for which questionnaires are not completed and returned are that the questionnaire is undeliverable, the addressee is deceased, or the addressee makes a claim for exemption with proof.
When a questionnaire is returned, the Commissioner examines the answers to four questions to determine whether the person is qualified to serve. To be qualified, the person must provide answers confirming that he or she (1) is a citizen of the United States and a resident of Queens County, (2) is 18 years of age or older, (3) is able to understand and communicate in English, and (4) is not a convicted felon.[9] Approximately 20% of those who complete and return questionnaires are found qualified.
In Queens, the reason most often requiring disqualification of a person returning a questionnaire is a lack of citizenship. If a person is a citizen but claims to be unable to understand and communicate in English, he or she will be asked to come to the Jury Commissioner’s Office for a face-to-face interview. If a true language problem exists, the Commissioner will grant a one-year postponement and instruct the person to use the time to “brush up” on English. If, after the postponement, the person continues to claim a language difficulty, the issue is left to a judge. On occasion,, if an elderly citizen speaks little English and asserts an inability to learn, the Commissioner will grant *679 an excusal. The Commissioner attempts to qualify as many prospective jurors as possible, however, and excusal is a last resort.
If a returned questionnaire reveals that the person is qualified, his or her name goes directly into the qualified pool from which persons are randomly selected to receive jury summonses. The inclusion of those names replenishes the pool as persons are drawn from it for jury service.
Of those to whom jury summonses are sent, between 28 and 32% appear as required. Between 12 and 13% of summonses are returned as undeliverable.
Persons who do not appear in answer to a jury summons are marked “absent,” and their names are returned to the qualified pool. If such a person is again randomly selected to receive a jury summons, and again does not respond, his or her name is placed in the delinquent pool. That person will then be sent a delinquent summons threatening fine or imprisonment. Some 48% of those to whom a delinquent summons is sent appear. Those delinquent jurors who do not are eventually sent registered letters directing them to appear before a judicial hearing officer who may impose fines.
The summonses sent out for trial jurors are different from those sent to prospective grand jurors. On occasion, a person who has received a grand jury summons will appear at the Commissioner’s office before the report date to argue that lengthy grand jury service will be overly burdensome. The Commissioner tries to convince the person to serve but, if he or she is adamant, the Commissioner may change the summons to one for service on a trial jury.[10]
III.
In the last decade, the court system has taken several steps to make jury service less burdensome and the pool of jurors more inclusive. Thus, for example, in 1996, traditional exemp *680 tions from jury service were abolished.[11] This brought approximately a million persons into the potential jury pool who had not been there before. Also changed was the language competency requirement. Jurors who once had to be able to read and write English now needed only to be able to understand and communicate in the language.[12]
Moreover, in 1996, the permanent qualified lists were abandoned. Until that time, persons who were disqualified for having recently done jury service would automatically be returned to the qualified pool when their disqualifications expired. Since, for all others, a process of random selection preceded receipt of a questionnaire and inclusion in the qualified pool, a person who had done jury service before had a far greater chance of being called again to serve than did a person who had never before been called.
Now, with the abolition of the permanent qualified lists, a person whose good-service disqualification expires is removed from the automated jury file and, if still on one of the source lists, becomes eligible again to be randomly selected to receive a questionnaire and to go through the qualifying process. As a result, notwithstanding his or her prior service, that person would be no more likely to receive a jury summons than would anybody else equally qualified.
In 1997, UCS expanded its sources of prospective jurors by using lists of all persons in the state who received family or safety net assistance, and all persons in the state who received unemployment compensation.[13] This was done in an attempt to reach the economically disadvantaged, and to include them in the potential juror pool.
Significantly, at oral argument following the hearing, lead counsel for the defense candidly stated: “I have been given no reason to doubt that when New York decided to move to five lists, they did so with the intention of including more people.”[14] I agree (see, e.g., People v Grant, 226 AD2d 1092 [4th Dept 1996], lv denied 82 NY2d 895).
Indeed, the evidence establishes beyond question that the intention at all levels of the jury selection process is to be more inclusive, not to discriminate against any recognizable or *681 distinct class of citizens. And random selection is the process used throughout.
To the extent that the face-to-face interviews by the Commissioner of Jurors make the selection system “susceptible of abuse,” any resulting presumption of discriminatory intent has been more than rebutted (see, Guzman, 60 NY2d at 413; United States v Rioux, 97 F3d 648, 659 [2d Cir 1996]). Aside from her assertions that all jurors are treated equally regardless of race or ethnicity, Ms. Cuffey testified that face-to-face interviews are conducted only with those who return questionnaires claiming a disqualifying inability to understand and communicate in English. The Commissioner urges such prospective jurors to improve their language skills and affords them an opportunity to do so. And, if a potential grand juror comes in claiming that lengthy service will be unduly burdensome, the most the Commissioner will do is change the summons to one for service on a trial jury.
Thus, this is not a process by which government officials select and reject citizens for jury service in circumstances that permit discrimination by those who are of a mind to engage in it (see, e.g., Alexander v Louisiana, 405 US 625 [1972]). Here, the personal confrontations are conducted only with people who claim in the first instance to be unable to serve (cf. People v Parks, 41 NY2d 36, 44 [1976]), and the government official, rather than granting an exemption automatically upon the claim (cf. Duren v Missouri, 439 US 357, supra), attempts to convince the claimants to serve, either as called or in another capacity.
In my view, there has been no showing whatsoever of any discriminatory intent, either presumed or actual, at any stage of the jury selection process, and therefore the defendant’s equal protection claim must fail (People v Guzman, 60 NY2d 403, supra). I turn then to the alleged fair cross-section violation which requires no such intent (see, e.g., United States v Jackman, 46 F3d 1240, 1246 [2d Cir 1995]).
IV.
The defendant argues that the methods of jury selection employed in Queens County systematically exclude Hispanics, “the poor,” and “the young” because (1) the lists used, both before and after they are merged, are stale, (2) the merged lists contain a large number of duplicate names, (3) the source lists are not representative, (4) Queens extensively uses volunteers, and (5) the system has no monitoring mechanism *682 to detect underrepresentation. I address these seriatim, and focus on Hispanics because neither “the young” nor “the poor,” especially as defined at the hearing,[15] describe groups that are distinctive within the contemplation of the fair cross-section requirement (see, e.g., Willis v Kemp, 838 F2d 1510, 1515-1516 [11th Cir 1988], cert denied sub nom. Willis v Zant, 489 US 1059 [“the young”]; United States v McDaniels, 370 F Supp 298, 307 [ED La 1973], affd 509 F2d 825 [5th Cir 1975], cert denied 423 US 857 [“the poor”]; People v Hale, 173 Misc 2d 140 [Sup Ct, Kings County 1997, Tomei, J.] [“the young” and “the poor”]; People v Mateo, 175 Misc 2d 192 [Monroe County Ct 1997, Connell, J.] [“the young” and “the poor”]).
Staleness
The defendant has failed to offer any reason to believe that the compilation of names provided to UCS by the agencies supplying the source lists contains anything other than the most recent information available. Moreover, UCS takes all reasonable steps to keep its own lists current. It calls for new source lists every year. The automated jury files are periodically purged to eliminate those persons who, although having completed a questionnaire, are not randomly selected to be sent a jury summons within 18 months. Additionally, the names of those persons who were sent but failed to return a jury questionnaire are removed from the automated jury files after eight months.[16] And, locally, the qualified jury pool for Queens is periodically purged to remove those who have been in the pool for 18 months without having been randomly selected to receive a jury summons.
Professor Beveridge testified that staleness of the lists would result in underrepresentation largely because Queens is experiencing a significant influx of Hispanics. He reasoned that a lag in the gathering of names would mean that the names of *683 large numbers of recently-arrived. Hispanic residents of the county would not be included in the source lists and therefore in the jury pools. But he did not testify that the newly-arriving Hispanic population is comprised primarily of citizens as opposed to immigrants. Since citizenship is a requirement for jury service, the failure to promptly gather names of recently-arrived Hispanics who are not citizens would have no cognizable effect on the representativeness of the source lists or the jury pools.
In my view, therefore, the defendant has failed to show that the lists used, either before or after they are merged, are needlessly or unreasonably stale, or that, even if they were, the staleness would result in a cognizable underrepresentation of Hispanic citizens in the jury pools.
Duplicates
At the hearing, there was some confusion over the extent to which duplicate names remain in the merged lists. Both sides agree, however, that the job of detecting and eliminating duplicates in a system as large as New York’s is daunting. It is clear that UCS is continuing its efforts to improve duplicate detection, going so far recently as to contract with an outside firm to devise better ways of doing so. That is not to say, however, that duplicates no longer present a problem. But the issue here is whether that problem produces an underrepre-sentation of Hispanics.
According to the hearing testimony, undetected duplicates in a merged list affect the randomness of any selection made from it. The motion at bar, however, does not challenge the randomness of the selection but the representativeness of the result. According to Professor Beveridge, the failure to remove duplicates will affect that representativeness if the source lists themselves are unrepresentative because, when duplicates remain undetected in a merged list, any unrepresentativeness in the source lists becomes exacerbated and amplified. Thus, any failure to remove duplicates would be relevant here principally to the extent that the source lists underrepresent Hispanics. I therefore turn to examine that question.
Source Lists
Professor Beveridge estimates that the list of registered voters underrepresents Hispanics, not because anything inherent in the process of registering to vote in New York discourages Hispanics from doing so, but because he believes that Hispan *684 ics simply register to vote in smaller numbers than do their fellow citizens. He estimates that the list of licensed drivers underrepresents Hispanics, not because anything inherent in the process of obtaining a license in New York discourages Hispanics from doing so, but because Queens is one of only 12 counties in the nation where less than half the employed population drives to work. That fact suggests to the professor that Hispanics, who are generally poorer than their fellow citizens, would be less likely to be among those who drive. Finally, Professor Beveridge estimates that the list of those who filed tax returns underrepresents Hispanics, not because anything inherent in the process of filing tax returns in New York discourages Hispanics from doing so, but because any list of persons filing tax returns would be skewed toward people with money, and therefore Hispanics, who are generally poorer, would be less likely than their fellow citizens to file tax returns.
According to Professor Beveridge, because Hispanics are among the poorer groups with less gainful employment, they would be overrepresented on any list of those receiving family or safety net assistance, and underrepresented on any list of those receiving unemployment compensation. But the professor believes that the number of names on those lists is so small when compared with the other three lists used by UCS that their effect on overall representativeness is insubstantial.
The defendant argues that, without disclosure of the source lists and other jury material, there is no way to confirm Professor Beveridge’s findings and conclusions. In my view, however, a determination of whether or not those findings and conclusions are accurate is unnecessary for the resolution of the defendant’s motion.
Some might dismiss the professor’s conclusions as based more on supposition and unsupported generalizations about ethnic groups than on research and science. But, even if his reasoning and conclusions were correct, any underrepresentation of Hispanics on the source lists would not be due to anything inherent in the system. Rather, if the professor’s theories are correct, underrepresentation of Hispanics on the source lists would be the result of voluntary and unencouraged behavior patterns of members of the Hispanic community to vote less, drive less, and file tax returns with less frequency than their fellow citizens.
Underrepresentation resulting from voluntary behavior patterns, unencouraged by state action, does not make out systematic exclusion (see, e.g., Guzman, 60 NY2d at 411; People v *685 Cowan, 111 AD2d 343, 344 [2d Dept 1985], lv denied 65 NY2d 978; People v Mateo, 175 Misc 2d at 213-214; see, also United States v Rioux, 97 F3d at 658).[17] Thus, without the need for further disclosure, I conclude that any lack of representativeness on the source lists, or on the merged list compiled from them, does not establish a fair cross-section violation.[18]
Volunteers
The defendant next maintains that the “extensive” use of volunteers causes an underrepresentation of Hispanics because, according to Professor Beveridge, those who volunteer for jury duty are likely to be better off financially and therefore are less likely to be Hispanic since, as a group, Hispanics tend to be poorer in Queens County than their fellow citizens. Moreover, the defendant points to a 1998 report that asserts that the grand jury clerk in Queens asks those who do report for grand jury duty whether they are “ready to serve.” This, the defendant suggests, indicates that the clerk is looking for, and gets, volunteers.
First, there is no evidence that the use of volunteers is “extensive.”[19] Ms. Cuffey testified that, when a person volunteers for jury duty, he or she is given a questionnaire and, if found qualified to serve and not disqualified by reason of recent service, the person will be placed in the qualified juror pool. Ms. Cuffey was not asked about the number of volunteers, but *686 she did say that the Commissioner does nothing to solicit or encourage volunteers.[20]
Second, the reported statement of the grand jury clerk is clearly meant only to determine whether service on a grand jury would create an undue hardship for any of the persons present. The fair cross-section requirement does not demand that volunteers be rejected or that prospective jurors bear undue hardship on account of their service (cf. People u Chestnut, 26 NY2d 481, 490 [1970]).
Monitoring
Clearly, a lack of monitoring, standing alone, does not establish a systematic exclusion of any group. Significantly, no evidence was presented, anecdotal or otherwise, to suggest a noticeable absence of Hispanics in the jury pools of the county.[21] Moreover, the defendant does not offer a clear vision of what monitoring would accomplish.
Asked what he would do if the monitoring of a seemingly effective selection system revealed that it was producing an un-derrepresentation of a substantial and identifiable group, he responded, “you would look for something weird * * * that’s going on in the system because this is a complex social system.”[22] He conceded, however, that affirmative steps to remedy any such underrepresentation, detected through monitoring but not attributable to the system in place, would have implications for the randomness of selection (see, United States v Rioux, 97 F3d at 658-659).[23]
*687 V.
Aside from the foregoing, to fully evaluate the defendant’s challenge here, it is instructive to compare the jury selection procedures employed in Queens against a sampling of those declared to be violative of fair cross-section guaranties. Virtually every one of those defective systems was such as to make underrepresentation of a distinct group inevitable or highly likely and expected. Thus, for example, in Taylor v Louisiana (419 US 522 [1975]), the controlling statute provided that no woman should be selected for jury service unless she had previously filed a written declaration of her desire to serve. In Duren v Missouri (439 US 357, supra), the controlling statute provided that any woman requesting not to serve would receive an automatic exemption. And, in United States v Osorio (801 F Supp 966 [D Conn 1992]), all residents of two cities with large minority populations were inadvertently excluded from venires by the jury selection system through an apparent computer error. Nothing of the sort has been shown to exist in Queens.
At the hearing, Professor Beveridge was asked what system of jury selection he would use if he were creating one for Queens County on a clean slate. He replied that he would use only a list of registered voters since all persons on the list would be citizens, the list would likely be fresher, and the use of a single list would avoid the problem caused by duplicates. Asked what he would do if the use of the voter list alone nevertheless produced an underrepresentation of a distinct group, the professor replied: “I think then you would have a commission, a committee, and you would find out what to do.”[24]
In contrast, Mr. Mount testified that UCS elected to use more lists because they reach a greater portion of the eligible population. He testified that, while use of the voter list alone allows UCS to reach between 50 and 60% of the 18-and-over population, adding the list of licensed drivers brings that number up to about 70%. And using all five lists lets UCS reach approximately 90% of the target population.
Mount conceded that merging the lists has in the past produced duplicates of up to 10 or 15%, and even now produces almost 5%. But UCS opted to suffer and address the problem of duplicates in order to reach more of the population eligible for jury service.
*688 Professor Beveridge’s preference for one list over multiple lists is by no means universally shared (see, e.g., Cynthia A. Williams, Note, Jury Source Representativeness and the Use of Voter Registration Lists, 65 NYU L Rev 590, 632-633 [1990]). And, in any event, it has long been settled that states have wide discretion in formulating their own procedures for the selection of juries, provided only that the source from which juries are derived “reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty” (Brown v Allen, 344 US 443, 474 [1953]; see, also, Taylor v Louisiana, 419 US at 528; People v Parks, 41 NY2d at 42).
But even if it could be shown that Professor Beveridge’s proposal was a better method for selecting juries, the system in place would not thereby be rendered deficient. In constitutional jurisprudence, it is rarely wise and always unnecessary to make the perfect the enemy of the good.[25]
For all his arguments regarding alleged statistical anomalies and numbers that do not add up, the defendant’s challenge to the jury selection system in Queens rests, in the last analysis, on the dubious and constitutionally irrelevant proposition that the county’s Hispanic citizens vote less, drive less, file tax returns less frequently, and volunteer to perform important civic duties less often than their fellow citizens.
Clearly, the defendant has failed to show that the method by which the grand juries in this case were selected violated either his right to equal protection or his due process right to a grand jury drawn from a fair cross-section of the community (see, e.g., United States v Joyner, 201 F3d 61, 75 [2d Cir 2000]). And he has likewise failed to show that additional disclosure of jury selection material is necessary to determine his claims.
Accordingly, the defendant’s motion to dismiss the indictments and to release materials relating to jury selection in Queens County should be denied in all respects.

. Motion No. 8, Youngblood affirmation, at 6-7.

. Id. at 8.

. Moreover, consistent with constitutional requirements, “[i]t is the policy of this state that all litigants in the courts of this state entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in the county or other governmental subdivision wherein the court convenes; and that all eligible citizens shall have the opportunity to serve on grand and petit juries in the courts of this state, and shall have an obligation to serve when summoned for that purpose, unless excused.” (Judiciary Law § 500.)

. Motion No. 8, notice of motion, at 1.

. Defendant’s posthearing memorandum of law, at 48.

. Id.

. Section 509 (a) of the Judiciary Law provides in pertinent part: “The commissioner of jurors shall determine the qualifications of a prospective juror on the basis of information provided on the juror’s qualification questionnaire. * * * A record of the persons who are found not qualified or who are excused, and the reasons therefor, shall be maintained by the commissioner of jurors. * * * Such questionnaires and records shall be considered confidential and shall not be disclosed except to the county jury board or as permitted by the appellate division.” (Emphasis supplied.)

. There are times during the year when few jury trials are conducted. For example, the civil term of the Supreme Court is essentially closed except for emergencies during the eighth term of court, and virtually no jury trials are conducted during Christmas week each year.

. >See, Judiciary Law § 510.

. Contrary to suggestions made at the hearing, the number of jurors replenishing the qualified pool is roughly equivalent to the number drawn from it. Approximately 15,000 questionnaires are sent out each week. Of these, some 50% or 7,500 are returned and 20% of those — some 1,500 — are found qualified and enter the qualified pool. Meanwhile, approximately 5,500 jury summonses are sent out each week, with some 30% or 1,650 appearing. Those 1,650 are removed from the qualified pool, while the rest — jurors summoned but failing to appear — remain in the pool.

. See, L 1995, ch 86, §§ 4, 5 (eff Jan. 1, 1996), repealing Judiciary Law §§ 511, 512.

. See, Judiciary Law § 510 (4), as amended by L 1995, ch 86, § 3 (eff Jan. 1, 1996).

. See, Judiciary Law § 506.

. Transcript of hearing, at 1978.

. At the hearing, Professor Beveridge defined “poor” as “near the poverty line.” (Transcript of hearing, at 1784.) He explained that he often uses 200% of the federal poverty line or approximately $40,000 per year for a family of four. (Id. at 1785, 1866.) He was unable to say how many of the “poor,” as so defined, live in Queens. Asked what he meant by “the young,” he responded: “It could be defined under 35, under 30. * * * I generally look at under 30 because that sort of became kind of a don’t trust anyone * * * over 30, that sort of thing. * * * So that’s kind of like what you use, but people use, I mean, every time people define youth, they define it differently. There’s generation ‘X’ and ‘Y’ and ‘Z’ probably by now.” (Id. at 1784.)

. Mount testified that action is not taken for eight months in order to allow the local Commissioner of Jurors an opportunity to try again to get the individual to complete and return a questionnaire.

. Professor Beveridge also testified that staleness of the source lists would cause an underrepresentation of Hispanics because they move within the county more frequently than their fellow citizens. Assuming that were true, the tendency to be transient would also constitute a voluntary behavior pattern unencouraged by state action.

. Well after the hearing, Professor Beveridge submitted a “Supplemental Affidavit” asserting that, based upon the testimony, “it is plain that the system in Queens will exclude many students from the jury system.” He averred that “[s]tudents in general would be less likely to drive, less likely to vote, less likely to pay taxes, less likely to receive unemployment compensation and less likely to be receiving ‘welfare’ benefits than other adults in Queens County.” (Beveridge supplemental affidavit, at 1.) Aside from the fact that these unsupported assertions come inexplicably late and therefore cannot be cross-examined, they suggest nothing more than the very same type of voluntary behavior patterns that are unencouraged by state action and therefore do not make out systematic exclusion.

. Judiciary Law § 506 specifically provides that prospective jurors may be selected at random, inter alia, from among “persons who have volunteered to serve as jurors by filing with the commissioner their names and places of residence.”

. In Professor Beveridge’s “Supplemental Affidavit,” he also asserts that “[flew students will volunteer for jury service, certainly proportionately fewer than will non-students. Many students have demanding work and class schedules and would not have the time or inclination to volunteer for jury service. * * * Based upon my experience at Queens College, where I have taught since 1981,1 cannot remember a single instance, where a student requested to be excused or to receive an extension for any of my classes, assignments or exams due to jury service. Many students proffer a wide variety of excuses in such situations.” (Beveridge supplemental affidavit, at 2.)

. My own experience and the experience of the trial judges whom I supervise as Administrative Judge of the Queens Supreme Court is that jury pools in this county include large numbers of Hispanics.

. Transcript of hearing, at 1857.

. (Id. at 1859.) Moreover, unless the underrepresentation of a distinct group is actually caused by the selection system in place, a jury commissioner is not bound “to undertake a recruitment operation or to pursue procedures specifically designed to insure that the representation of [that *687 group is] increased” (People v Betancourt, 153 AD2d 750, 754 [2d Dept 1989], lv denied 75 NY2d 767, supra).

. Transcript of hearing, at 1929.

. See, Voltaire, Dictionnaire Philosophique (Dramatic Art) (1764) (“Le mieux est l’ennemi du bien” — "the best is the enemy of the good”).